**ORAL ARGUMENT NOT YET SCHEDULED**

No. 22-1272 (Consolidated with No. 22-1297)

---

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

HOSPITAL DE LA CONCEPCION, INC.,

Petitioner/Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent/Cross Petitioner.

---

Petition for Review from a Decision and Order of
the National Labor Relations Board, 371 NLRB No. 155 (September 29, 2022)

---

**BRIEF OF PETITIONER**

---

| | _s/José R. González Nogueras,Esq._<br>**USCA-DC No. 53881**<br>jgonzalez@pg.legal<br>**Pizarro & González**<br>P.O. Box 194302<br>San Juan. PR 00919-4149<br>Telephone: (787) 767-7777<br>Facsimile: (787) 763-2286<br>_Attorney for Petitioner/_<br>_Cross-Respondent_ |
|---|---|

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit 28(a)(1), Petitioner certifies as follows:

**1) Parties and *Amici***

a) <u>Petitioner:</u> The Petitioner in this matter is Hospital de la Concepción.

b) <u>Respondents:</u> The Respondents in this matter are the National Labor Relations Board and Unidad Laboral de Enfermeras(os) y Empleados de la Salud.

c) *<u>Amici Curiae:</u>* There are no *Amici Curiae* at this time.

**2) Rulings under review**

a)  The ruling under review in this proceeding is the Decision and Order of the National Labor Relations Board entered on September 29, 2022, in <u>Hospital de la Concepción and Unidad Laboral de Enfermeras(os) y Empleados de la Salud,</u> in Board Case 12-CA-260107, 371 NLRB No. 155 (2022).

**3) Related Cases**

a) There are no known related cases pending before this Court or any other court.

## CORPORATE DISCLOSURE STATEMENT

In compliance with Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Petitioner Hospital de la Concepción, Inc. (the "Hospital"), located at San Germán, Puerto Rico, states that it is a private not-for-profit corporation incorporated in 1956 in accordance with the laws of the Commonwealth of Puerto Rico and affiliated to the Diocese of Mayagüez, Puerto Rico, of the Roman Apostolic Catholic Church. The Diocese of Mayagüez is composed of thirty (30) parishes in the western region of Puerto Rico.

The Hospital is an acute care hospital that provides inpatient, outpatient, and emergency care services for residents of the southwestern area of Puerto Rico for the physical and spiritual wellbeing of its patients according to the principles of Catholic ethics.

The Hospital does not have a parent corporation and there is no publicly held corporation that has a 10% or greater interest in Hospital.

# TABLE OF CONTENTS

**Pages**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ...................................................................................... *ii*

CORPORATE DISCLOSURE STATEMENT .......................... *iii*

TABLE OF CONTENTS .......................................................... *iv-v*

TABLE OF AUTHORITIES ..................................................... *vi-vii*

GLOSSARY OF ABBREVIATIONS ........................................ *viii*

I.     JURISDICTIONAL STATEMENT ................................... 1

II.    STATEMENT OF THE ISSUES PRESENTED FOR REVIEW .... 1-3

III.   STATEMENT OF THE CASE ......................................... 3-13

    a.     Procedural Background ........................................... 3

    b.     Statement of the Case                                       4-13

IV.    SUMMARY OF THE ARGUMENT ............................... 13

V.     STANDING ................................................................. 14

VI.    STANDARD OF REVIEW ............................................ 14

VII.   ARGUMENT ............................................................... 14-41

    A.     The Reduction in Work Hours Implemented by the Hospital fell within the scope of the CBA.          14-25

    B.     The Hospital had a Sound Arguable Basis for Reducing the Work Hours.                                           25-32

    C.     Exigent Circumstances allowed the Hospital to Implement Reduction in Hours Without First Bargaining with the ULEES.                                                       32-34

     D.     <u>The Hospital Complied with Its Obligation to Provide</u>    34-40
            <u>Information.</u>

     E.     <u>The Board Should Deduct Interim Earning in Case of</u>    40-41
            <u>Award.</u>

VIII.   CONCLUSION ................................................................. 42

CERTIFICATE OF COMPLIANCE ........................................... 43

CERTIFICATE OF COMPLIANCE ........................................... 44

## TABLE OF AUTHORITIES

CASES                                                              Page(s)

ADT, LLC d/b/a ADT Security Services,
    369 NLRB No. 31 (2020) ................................................  35

Allied Chem. & Alkali Workers of Am., Local Union No. 1
v. Pittsburgh Plate Glass Co., 404 U.S. 157 (1971) ................................  26

Bath Iron Works Corp., 345 NLRB 499 (2005) .......................................  2, 26,
                                                                         27

Bath Marine Draftmen's Assn. v. NLRB,
    475 F.3d 14 (1st Cir. 2007) ......................................................  2

Bottom Line Enterprises, 302 NLRB 373 (1991) ..................................  32

F. W. Woolworth Co., 90 NLRB 289 (1950) ...........................................  40

Honeywell International, Inc. v. NLRB,
    253 F.3d 119 (D.C. Cir. 2001) ..............................................  17, 25

King Soopers, Inc. v. NLRB, 859 F.3d 23 (D.C. Cir. 2017).  .................  14

MV Transportation, Inc., 368 NLRB No. 66 (2019) ...............................  2, 13,
                                                                         15, 16,
                                                                         17, 26,
                                                                         27

NLRB v. Borg-Warner Corp.,
    356 U.S. 342 (1958) ............................................................  15

NLRB v. Katz,
    369 U.S. 736 (1962) ...........................................................  15

Ogle Protection Service, 183 NLRB 682 (1970), ....................................  40, 41

Pacific Maritime Association v. NLRB,
    967 F.3d 878 (D.C. Cir. 2020) ............................................  26

Phelps Dodge v. NLRB, 313 U.S. 177 (1941) .......................................... 41

RBE Electronics of S.D., Inc.,
    320 N.L.R.B. 80 (1995) ....................................................................... 32

Sierra Club v. EPA, 292 F.3d 895 (D.C. Cir. 2002)                        14

Southern California Gas Company and Utility Workers Union
    of America, Local 483, 342 NLRB 56 (2004) ..................................... 35

St. Joseph Medical Center, 350 NLRB 808 (2011) ................................. 16

Wayneview Care Center v. NLRB,                                           14
    664 F.3d 341 (D.C. Cir. 2011) ...........................................................

## FEDERAL STATUTES

29 U.S.C. §151 et seq. ............................................................................... 1

29 U.S.C. §§ 151, 160(a) ......................................................................... 1

29 U.S.C. §§ 160(e) ................................................................................. 1

29 U.S.C. §§ 160(f) .................................................................................. 1

29 U.S.C. § 158(a)(1) ............................................................................... 26

29 U.S.C. § 158(a)(5) ............................................................................... 26

29 U.S.C. § 158(d) ................................................................................... 26

# GLOSSARY OF ABBREVIATIONS

| Term | Abbreviations |
| --- | --- |
| Administrative Law Judge | ALJ |
| ALJ Decision | ALJD |
| Collective Bargain Agreements | CBAs |
| Counsel for the General Counsel | CGC |
| General Counsel's Exhibits | GC Ex. |
| Hospital de la Concepción, Inc. | Hospital or HDLC |
| HDLC'S Exhibits | HDLC Ex. |
| Joint Appendix | JA |
| National Labor Relations Act (29 U.S.C. §151 *et seq.*) | NLRA or Act |
| National Labor Relations Board | NLRB or Board |
| NLRB's Decision and Order issued on September 29, 2022, Reported at 371 NLRB No. 155 | Decision |
| Transcript of Hearing | Tr. |
| Unidad Laboral de Enfermeras(os) y Empleados de la Salud | Union or ULEES |
| [Corrected Deferred Joint Appendix] | CDJA |

# I.    JURISDICTIONAL STATEMENT

The NLRB had jurisdiction over the underlying action pursuant to Section 10(a) of the Act. 29 U.S.C. §§ 151, 160(a). This Court has jurisdiction under Section 10(e) and (f) of the Act. 29 U.S.C. §§ 160(e) and (f). The Board's Decision is a final order granting relief on CGC's allegations. The Hospital, as an "aggrieved party", timely petitioned for review on October 24, 2022. The Board filed a cross-application for enforcement on November 21, 2022, pursuant to 29 U.S.C. §160(e), which was consolidated with the Hospital's Petition for Review on November 22, 2023, and treated as a cross-appeal.

# II.    STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

The Hospital raises fifteen (15) issues for the Court's review: *(1)* Whether the Board erred in finding that the Hospital had to bargain with the Union the decision to implement a reduction in work hours and its effects; *(2)* Whether the Board erred in affirming the ALJ's finding that the Hospital unilaterally reduced the work hours of employees represented by the Union in violation of the Act; *(3)* Whether the Board erred in finding that Article XXXII, Administration Rights, of the CBAs, does not allow the Hospital to implement the reduction in work hours without bargaining with the Union; *(4)* Whether the Board erred in affirming the ALJ's conclusion that the Hospital did not establish that its unilateral reductions of unit employees' work hours fell within the compass or scope of contract language granting it the right to

act unilaterally; *(5)* Whether the Board erred in finding that the Hospital's reduction in employees' work hours was not an exercise of its right to "establish work shifts", "make changes to the same", "assign personnel to cover said shifts", or determining the number of employees", among others; *(6)* Whether the Board erred in finding that the employees represented by the Union had a fixed guaranteed number of weekly work hours; *(7)* Whether the Board incorrectly applied its own precedent in MV Transportation, Inc., 368 NLRB No. 66 (2019); *(8)* Whether the Board erred by failing to find that the Hospital had a sound arguable basis for its interpretation of the Collective Bargaining Agreements which was not motivated by animus against the Union or bad faith; *(9)* Whether the Board incorrectly failed to apply its own precedent in Bath Iron Works Corp., 345 NLRB 499, 501 (2005), *affd sub nom.* Bath Marine Draftmen's Assn. v. NLRB, 475 F.3d 14 (1st Cir. 2007); *(10)* Whether the Board incorrectly found that there were no exigent circumstances that allowed the Hospital to implement a reduction in work hours without prior bargaining with the Union; *(11)* Whether the Board erred in affirming the ALJ's conclusion that the Hospital did not meet its burden of demonstrating that economic exigencies allowed it to reduce employees' work hours without notifying or bargaining with the Union; *(12)* Whether the Board erred in affirming the ALJ's erroneous finding that the Hospital violated the Act by failing and refusing to provide the Union with the information it requested; *(13)* Whether the Board erred in affirming the ALJ's

determinations when the clear preponderance of all of the relevant evidence proved otherwise; *(14)* Whether the Board erred in imposing a calculation method that does not allow for reduction of interim earnings to reduce back pay; and *(15)* Whether the Board erred in awarding extraordinary remedies, such as making whole affected employees for any loss of benefits, including but not limited to any loss of accumulated time off for vacation, sick time, holidays, and continuing education and any loss of Christmas bonuses, that resulted from the reduction in work hours.

## III.    STATEMENT OF THE CASE

### a. Procedural Background

On April 2, 2021, the CGC issued a Complaint and Notice of Hearing against the Hospital alleging that the Hospital committed violations to sections 8(a)(5) and (1) of the Act by failing to provide the Union notice and opportunity to bargain over the decision and effects of reducing bargaining unit employees' work hours and by failing to and refusing to provide information requested by the Union. [CDJA-Vol. III. Pt. 2. p. 1778] The Hospital filed its Answer to Complaint on April 16, 2021, and an Amended Answer to Complaint on June 7, 2021. [CDJA-Vol. III. Pt. 2., p. 1778]. The Hearing before an ALJ was held from June 9 through June 11, 2021, through videoconference using the Zoom for Government platform. [CDJA-Vol. III. Pt. 2., p. 1778]. On December 22, 2021, the ALJ issued a Decision finding that the Hospital violated Section 8(a)(5) and (1) of the NLRA. [CDJA-Vol. III. Pt. 2. p.

1777]. The ALJ the issued an Errata to her decision on January 10, 2022. [CDJA-Vol. III. Pt 2.  p. 1803]. On September 29, 2022, the Board issued a Decision and Order and affirmed the ALJD. [CDJA-Vol. III. Pt 2. p. 1910].

## b. <u>Statement of the Case</u>

HDLC and Union have a bargaining relationship with the most recent CBAs being in effect from May 24, 2018, to May 31, 2021. [CDJA-Vol. I. GC Ex. 2(b), p. 126-127; GC Ex. 3(b), p. 209-210; GC Ex. 4(b), p. 292-293; GC Ex. 5(b), p. 372-373]. The Union represents employees in four (4) different bargaining units at the Hospital. [CDJA-Vol. I. GC Ex. 2(b), p. 101; GC Ex. 3(b), p. 183; GC Ex. 4(b), p. 266; GC Ex. 5(b), p. 349]. Even though each bargaining unit has their own CBA, the language of the CBAs is similar except for the articles that relate to the particular unit. [CDJA-Vol. III. Pt 2. Tr., p. 1609, ln. 12 – 22].

Mr. Ariel Echevarria is a representative for the ULEES and negotiates collective bargaining agreement with employers such as Hospital. [CDJA-Vol. III. Pt 1. Tr., p. 1488, ln. 16 – p. 1489, ln. 12].  Mr. Echevarria was the main spokesperson in charge and participated in the bargaining process with the Hospital that led to the execution of the CBA that went into effect in 2018. [CDJA- Vol. III. Pt 1.  Tr., p. 1490, ln. 16 – 17; CDJA- Vol. III. Pt 2 – Tr., p. 1606, ln. 23 – p. 1607, ln. 9]. Said bargaining included bargaining over the language to be included in the agreement. [CDJA- Vol. III. Pt 2 Tr., p. 1607, ln. 19 – 23]. Mr. Jorge Rodríguez

("Rodriguez") was the Hospital's Human Resources Director during the year 2020. [CDJA- Vol. III. Pt 1 Tr., p. 1491, ln. 12 – 14; CDJA- Vol. III. Pt 2 Tr., p. 1652, ln. 2 – 8].

Section A of Article XIII of the CBAs state that "[t]he weekly regular workday will be 40 hours within a period of 168 hours each week. The regular daily workday will be of 8 hours within a period of 24 consecutive hours." [CDJA- Vol. I. GC Ex. 2(b), p. 102-103; GC Ex. 3(b), p. 184-185; GC Ex. 4(b), p. 267-268; GC Ex. 5(b), p. 350-351].

Section A of Article XIV of the CBAs provide that "every employee covered by [the CBA] will be entitled to two days of rest for every 5 consecutive days of work". [CDJA- Vol. I. GC Ex. 2(b), p. 104; GC Ex. 3(b), p. 186; GC Ex. 4(b), p. 269; GC Ex. 5(b), p. 352]. Article XV of the CBAs establish that "[e]very employee will enjoy a period of one (1) hour or half an hour (1/2) to take their meals" and if an employee does not take his meal period, "the Hospital will pay said hour or half (1/2) an hour based on the regular pay per hour of the employee".) [CDJA- Vol. I. GC Ex. 2(b), p. 105; GC Ex. 3(b), p. 187; GC Ex. 4(b), p. 270; GC Ex. 5(b), p. 353]. Article XVII of the CBAs between the Hospital and the Union provide that "[e]mployees shall receive full pay even if they do not perform any work during the holidays" listed in the article. [CDJA- Vol. I. GC Ex. 2(b), p. 106-107; GC Ex. 3(b), p. 188-189; GC Ex. 4(b), p. 271-272; GC Ex. 5(b), p. 354-355].

Article XXII of the CBAs provide, in part, that the Hospital "shall grant a Christmas bonus to the employees covered by [the CBAs]". [CDJA- Vol. I. GC Ex. 2(b), p. 110; GC Ex. 3(b), p. 194; GC Ex. 4(b), p. 277; GC Ex. 5(b), p. 358]. Article XXIII of the CBAs state, in part, that the Hospital "will provide a life insurance of $14,000.00 for every employee in this agreement." [CDJA- Vol. I. GC Ex. 2(b), p. 111; GC Ex. 3(b), p. 195; GC Ex. 4(b), p. 278; GC Ex. 5(b), p. 359] [CDJA- Vol. III. Pt 2 Tr., p. 1621, ln. 5 – p. 1622, ln. 1]. Article XXVI of the CBAs provide that the Hospital "will pay the employees who are required to wear uniforms the amount of $300 per year." [CDJA- Vol. I. GC Ex. 2(b), p. 112; GC Ex. 3(b), p. 196; GC Ex. 4(b), p. 279; GC Ex. 5(b), p. 360].  [CDJA- Vol.  III. Pt 2 Tr., p. 1622, ln. 2 – 20].

Article XXIV of the CBAs provides that if there is an increase in the medical plan the Hospital provides the unit employees, the Hospital will notify the Union to consider more economic alternatives. [CDJA- Vol. II. HDLC Ex. 28-31., pgs. 1396-1403, Vol. III. Pt.1 pgs. 1398-1403].

Article XXXII of the CBAs, Administration Rights Article, states, in part, "Nothing agreed herein will be understood as a limitation of the right of the Hospital to direct and administer its operations according to the criteria of its directors. (…) It is expressly recognized that these rights, powers, authority and prerogatives include, without any limitation whatsoever the full and exclusive control and operation of the hospital, (…) the method and manner in which said [medical

6

hospital services] will be rendered, (…); the right to establish work shifts; to make changes to the same and to assign personnel to cover said shifts (…) It also includes the right to promote and to put into effect safety measures and measures of conduct, the determination of the number of employees, the selection of new employees and the direction of all of its employees, including, without any limitation whatsoever, the (…) right to assign, reassign, temporarily suspend, reinstate, promote, withdraw, discipline, remove and transfer its employees." [CDJA- Vol. I. GC Ex. 2(b), p. 121-124; GC Ex. 3(b), p. 205-208; GC Ex. 4(b), p. 288-291; GC Ex. 5(b), p. 369-371]. The Administration Rights Article in the CBAs provide the Hospital with the power to administer the Hospital and reserved the right to the Hospital to change work shifts, reorganize, run its operations. [CDJA- Vol. III. Pt 2 Tr., p. 1708, ln. 2 – 18].

Article XXXIV of the CBAs between the Hospital and the Union is the Exclusion Clause article in which the parties acknowledged that there was no obligation to bargain anything not covered by the CBAs. [CDJA- Vol. I. GC Ex. 2(b), p. 125].

The CBAs between the Hospital and the Union cover full-time and part-time employees. [CDJA- Vol. III. Pt 2 Tr., p. 1643, ln. 14 – 19]. The CBAs between the Hospital and the Union do not establish a guaranteed minimum number of hours for the unit employees. [CDJA- Vol. III. Pt 2 Tr., p. 1725, ln. 3 – 7].

7

On March 15, 2020, the then Governor of Puerto Rico issued Executive Order OE-2020-023, which imposed a curfew on the residents of Puerto Rico requiring the residents to remain in their homes until March 30, 2020 and only allowing them to exit their homes for specific reasons. [CDJA- Vol. II. GC Ex. 15 p. 1348-1352]. [CDJA- Vol. III. Pt 1 Tr., p. 1435, ln. 3 – 13; CDJA- Vol. III. Pt 2 Tr., p. 1679, ln. 22 – p. 1680, ln. 8]. On March 30, 2020, the Governor of Puerto Rico issued Executive Order OE-2020-029, whereby a lockdown was put in place and citizens were instructed to remain in their place of residence or shelter 24 hours a day and 7 days a week. The Executive Order allowed citizens to leave their residence only for specific circumstances or if they were exempted from the Executive Order. The lockdown was put into effect from March 31, 2020, until April 12, 2020 or until further notice. [CDJA- Vol. II. GC Ex. 16, p. 1353-1363]. On April 12, 2020, the Governor of Puerto Rico issued Executive Order OE-2020-033, whereby the lockdown was extended from April 13, 2020, until May 3, 2020 or until further notice. [CDJA- Vol. II.  HDLC Ex. 27, p. 1374-1395]. The Executive Orders issued by the governor of Puerto Rico also cancelled elective surgeries and procedures. [CDJA- Vol. III. Pt 2 Tr., p. 1681, ln. 8 – 9].

After the Governor of Puerto Rico issued the COVID-19 pandemic declaration and island wide lockdown in Puerto Rico, between March and April 2020, fewer patients visited the Hospital. [CDJA- Vol. III. Pt 1 Tr., p. 1452, ln. 25 -

8

p. 1453, ln. 19; p. 1454, ln. 13 - 20]. The imposed lockdown caused a significant reduction in the number of hospitalized patients and admissions in the emergency room, as well as a reduction in the ambulatory services provided by the Hospital. [CDJA- Vol. III. Pt 2 Tr., p. 1680, ln. 2 – 7].

As a result of the Executive Orders, there was a reduction in the average daily patient census. [CDJA- Vol. III. Pt 2 Tr., p. 1681, ln. 16 – 21]. From February 2020 to April 2020, there was a decrease in the average daily census from 129 to 73. [CDJA- Vol. III. Pt 2 Tr., p. 1637, ln. 4 – 15] [CDJA- Vol. II. GC Ex. 12(a), p. 917].

Due to the impact that the pandemic had in the Hospital's operations, the Hospital implemented a reduction in working hours, suspension of contracts and leave without pay. [CDJA- Vol. III. Pt 2 Tr., p. 1681, ln. 22 – p. 1683, ln. 10]. On April 14, 2020, the Hospital notified its employees that the due to the effects of the COVID-19 pandemic, it would, among other measures, implement a reduction in work hours of the Hospital employees. [CDJA- Vol. II. HDLC Ex. 12, p. 1368-1370]. The reduction in work hours was extended to all departments in the Hospital, including administrative, such as the Human Resources department, and non-administrative departments, except for the respiratory therapy, environmental services, intensive care unit nurses, security, and medical technologists. [CDJA-Vol. III. Pt 2 Tr., p. 1683, ln. 11 – 24].

On April 15, 2020, the Hospital distributed letters to the Hospital's employees notifying a reduction in hours. [CDJA- Vol. III. Pt 2 Tr., p. 1652, ln. 25 – p. 1653, ln. 3]. [CDJA- Vol. I. GC Ex. 9(b) pgs. 802-807]. The Hospital informed that it was reducing work hours to protect its personnel from being infected with COVID-19, prevent exposure, contribute to social distancing, however, when the demand for hospital services increased, the employees would be contacted. [CDJA- Vol. I. GC Ex. 9(b) pgs. 802-807].

During the period that the reduction in hours was in effect, there was a reduction in the number of patients that visited the Hospital. [CDJA- Vol. III. Pt 1 Tr., p. 1436, ln. 1 – 7].

Mr. Jonathan Ruiz Bonet is an hourly employee that works for the Hospital since 2015 as an emergency room nurse. [CDJA- Vol. III. Pt 1 Tr., p. 1446, ln. 21 – p. 1447, ln. 4; p. 1455, ln.]. Mr. Ruiz was paid in a biweekly fashion for the hours he worked during the biweekly period. [CDJA- Vol. III. Pt 1 Tr., p. 1456, ln. 17 – 21]. In the pay period from October 14 to October 27, 2018, Mr. Ruiz worked less than eighty (80) hours, he worked 71.75 hours and was paid for 72.50 hours of work only. [CDJA- Vol. III. Pt 1 Tr., p. 1461, ln. 5 – p. 1462, ln. 4] [CDJA- Vol. II. HDLC Ex. 1, p. 1364]. Again, from November 11 to November 24, 2018, Mr. Ruiz was not paid eighty (80) hours of work, he was only paid for 71.25 hours, the hours worked in that period. [CDJA- Vol. III. Pt 1 Tr., p. 1464 ln. 12 - 25] [CDJA- Vol. II.

HDLC Ex. 1, p. 1364].  For the period from May 12 to May 25, 2019, Mr. Ruiz was not paid for eighty (80) hours of work, he was paid seventy-two (72) hours. [CDJA- Vol. III. Pt 1 Tr., p.  1465, ln. 3 - 14] [CDJA- Vol. II. HDLC Ex. 1, p. 1367].  Before April 2020, Mr. Ruiz was sent home early three (3) to four (4) times a year because of lack of work. [CDJA- Vol. III. Pt 1 Tr., p. 1474, ln. 11 – 22].

On April 15, 2020, the Union sent an e-mail requesting information related to the reduction in work hours announced. [CDJA- Vol. I. GC Ex. 6(b) pgs. 376-377]. [CDJA- Vol. III. Pt 2  Tr., 1630, ln. 5 – p. 1632, ln. 1].  The Union sought the information mentioned in the April 15, 2020, e-mail to bargain the reduction in hours implemented by the Hospital. [CDJA- Vol. III. Pt 1 Tr., p. 1510, ln. 8 – p. 1511, ln. 2, p. 1580, ln. 20 – p. 1581, ln. 1].  On April 16, 2020, the Union sent an additional request for information. [CDJA- Vol. III. Pt 1 Tr., p. 1514, ln. 15 – 18] CDJA- Vol. I. GC Ex. 7(b) p. 379].  The purpose of the April 16 request was to see what alternatives, if any, the Union could suggest to the Hospital to cease the reduction in work hours, to see what alternatives could be provided to the Hospital [CDJA- Vol. III. Pt 1 Tr., p. 1519, ln. 16 – 25]. The Union's April 16 letter sought to bargain the reduction in hours with the Hospital. [CDJA- Vol. III. Pt 1 Tr., p. 1581, ln. 24 – p. 1582, ln. 11].

On April 21, 2020, the Union sent an additional request for information to the Hospital requesting the names, classifications, hourly wage rates, and seniority of

the unit employees affected by the closure of the Endoscopy Department. [CDJA-Vol. I. GC Ex. 8(b) pgs. 382-383]. The purpose of the April 21 request of information was to bargain the decision. [ CDJA- Vol. III. Pt 1 Tr., p. 1530, ln. 19 – p. 1531, ln. 10].

On April 29, 2020, the Hospital responded to the Union's request of April 21, by providing the name, department, classification, salary, hire date or seniority, and position of all the employees in the endoscopy department as requested in the Union's April 21 request for information. [CDJA- Vol. III. Pt 1 Tr., p. 1588, ln. 11 – p. 1592, ln. 17] [CDJA- Vol. II. GC Ex. 13(a) pgs. 919-930]. On that same date, the Hospital sent several e-mails in response to the Union's requests for information of April 15, 16, and 21, 2020. [CDJA- Vol. III. Pt 1 Tr., p. 1534, ln. 13 – p. 1535, ln. 1; CDJA- Vol. III. Pt 2 Tr., p. 1633, ln. 6 – 10] [CDJA- Vol. I. GC Ex. 9(b) pgs. 802-807]. The Hospital also sent the Union a copy of the work programs of the areas impacted by the reduction in work hours. [CDJA- Vol. III. Pt 1 Tr., p. 1541, ln. 8 – 19] [CDJA- Vol. II. GC Ex. 10(b) p. 833]. On May 6, 2020, Mr. Jorge Rodríguez sent another e-mail in response to the Union's requests for information. [CDJA- Vol. III. Pt 1 Tr., p. 1568, ln. 15 – p. 1569, ln. 17] [CDJA- Vol. II. GC Ex. 14(b) pgs. 1143-1347]. On May 6 the Hospital answered all the requests that the Union made since April 15, 2020. [CDJA- Vol. III. Pt 1 Tr., p. 1576, ln. 1 – 13]. Among the information provided was the Hospital's average patient census, which showed a

decrease in the daily census for March and April 2020. [CDJA- Vol. III. Pt 2 Tr., 1633, ln. 11 – p. 1634, ln. 9]  [CDJA- Vol. II. GC Ex. 12(a) pgs. 916-917].

## IV.    SUMMARY OF THE ARGUMENT

The Board incorrectly determined that the Hospital had to bargain the decision and effects of a reduction in work hours on unit employees, despite language in the CBAs allowing the Hospital to implement such action without further bargaining with the Union. In its holding, the Board ignored the overall language of the CBAs and incorrectly held that the unit employees had a fixed guaranteed number of hours per workweek. Additionally, the Board ignored the holding of <u>MV Transportation, Inc.,</u> 368 NLRB No. 66 (2019), since the reduction in work hours implemented by the Hospital fell within the scope of the language in the CBAs. The Board also failed to consider that the CGC alleged that, by reducing the unit employees' work hours, the Hospital failed to assign unit employees to a minimum number of hours per day and per week in violation of the CBAs. In this scenario, the Board had to consider whether the Hospital had a "sound arguable basis" for its interpretation of the CBAs.

The Board further erred in holding that the Hospital failed to provide the Union with information it requested and was entitled to receive.

Finally, the Board improperly imposed a calculation method that does not allow for the reduction of interim earnings to reduce backpay and awarded extraordinary remedies.

13

## V.        STANDING

The Hospital has standing under Article III because the Decision injures HDLC by, among other things, requiring it to pay unit employees backpay to make them whole for the reduction in hours established as a result of the COVID-19 Pandemic, requiring it to bargain with the Union matters within the administration rights article of the CBAs, imposing a guaranteed minimum number of hours for unit employees, and post notices. *See* Sierra Club v. EPA, 292 F.3d 895, 900 (D.C. Cir. 2002).

## VI.        STANDARD OF REVIEW

The Court "may set aside a decision of the Board when it departs from established precedent without reasoned justification, or when the Board's factual determinations are not supported by substantial evidence." King Soopers, Inc. v. NLRB, 859 F.3d 23, 29-30 (D.C. Cir. 2017). Likewise, the Court may set aside a decision where "the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case." Wayneview Care Center v. NLRB, 664 F.3d 341, 348 (D.C. Cir. 2011).

## VII.        ARGUMENT

A. The Reduction in Work Hours Implemented by the Hospital fell within the scope of the CBA.

14

Section 8 (a)(5) and (d) require an employer to bargain with the union representing its employees "with respect to wages, hours, and other terms and conditions of employment." NLRB v. Borg-Warner Corp., 356 U.S. 342, 349 (1958). Wages, hours, and other terms and conditions of employment are commonly referred to as mandatory subjects of bargaining. An employer's duty to bargain over mandatory subjects of bargaining persists during the term of a collective bargaining agreement unless the parties, the employer and the union, bargained over the mandatory subject of bargaining during the negotiations of the collective bargaining agreement. MV Transportation, Inc., 368 NLRB No. 66, * 3 (September 10, 2019). "An employer violates Section 8 (a)(5) and (1) if it makes a material, substantial, and significant change regarding a mandatory subject of bargaining without first providing the union notice and a meaningful opportunity to bargain about the change to agreement or impasse, absent a valid defense." Id. (citing NLRB v. Katz, 369 U.S. 736, 747 (1962).

In MV Transportation, Inc., *supra*, the Board set aside the "clear and unmistakable waiver" standard to determine whether an employer's action was permitted by the collective bargaining agreement with the union. Thus, the Board will no longer look, *at first instance*, whether the union "unequivocally and specifically" expressed in the agreement that it allowed unilateral employer action with regard to a term and condition of employment, regardless of the statutory duty

15

to bargain. <u>MV Transportation, Inc.</u>, 368 NLRB No. 66, * 4 (quoting <u>St. Joseph Medical Center</u>, 350 NLRB 808, 811 (2011).

Under extant Board Law, in order to determine whether unilateral employer action is allowed under the collective bargaining agreement the Board will first apply the "contract coverage" standard. Under the "contract coverage" standard the Board will evaluate whether an employer's actions were covered by the collective bargaining agreement executed by the parties by analyzing the language of the agreements using ordinary principles of contract interpretation. If the employer's action falls within the scope of the contract provisions, then contract coverage standard applies, if it does not, then the Board focuses on whether the union waived its right to bargain using the "clear and unmistakable waiver" standard discussed above. *Id.*, * 2.

> [T]he Board will give effect to the plain meaning of the relevant contractual language, applying ordinary principles of contract interpretation; and the Board will find that the agreement covers the challenged unilateral act if the act falls within the compass or scope of contract language that grants the employer the right to act unilaterally. In applying this standard, the Board will be cognizant of the fact that "a collective bargaining agreement establishes principles to govern a myriad of fact patterns," and that "bargaining parties [cannot] anticipate every hypothetical grievance and . . . address it in their contract." Accordingly, [the Board] will not require that the agreement specifically mention, refer to or address the employer decision at issue. Where contract language

16

covers the act in question, the agreement will have authorized the employer to make the disputed change unilaterally, and the employer will not have violated Section 8(a)(5).

MV Transportation, Inc., 368 NLRB No. 66, *11. (citations omitted).

Additionally, even though, the "Board is empowered to interpret collective bargaining agreements when doing so is necessary to determine whether an unfair labor practice has occurred", it is the "federal courts, not the Board, [who] are legislatively empowered to be the primary interpreters of contracts." Honeywell International, Inc. v. NLRB, 253 F.3d 119, 420 (D.C. Cir. 2001).

In the instant case the language of the CBAs as a whole allowed the Hospital to implement a reduction in hours beginning in the month of April 2020 without bargaining with the Union. The language of several articles of the CBAs and the Management Rights Article in each CBA amply supports, that when the parties bargained over the CBAs, the parties agreed that the Hospital could implement a reduction in hours without further bargaining with Union.

Article XXXII of the four CBAs is the Management Rights Article which allows the Hospital to implement certain actions without further bargaining with the Union. [CDJA- Vol. III. Pt 2 Tr., p. 1610, ln. 14 – 24; p. 1708, ln. 2 – 18]. In particular, Article XXXII provides, in part,

Nothing agreed herein will be understood as a limitation of the right of the Hospital to direct and administer its operations according to the criteria of its directors. (…) It

17

is expressly recognized that these rights, powers, authority and prerogatives include, without any limitation whatsoever the full and exclusive control and operation of the hospital, (…) the method and manner in which said [medical hospital services] will be rendered, (…); **the right to establish work shifts; to make changes to the same** and to assign personnel to cover said shifts (…) **It also includes the right to promote and to put into effect safety measures and measures of conduct, the determination of the number of employees,** the selection of new employees and the direction of all of its employees, including, without any limitation whatsoever, the right to employ, re-employ, select and train new employees and the right to assign, reassign, **temporarily suspend,** reinstate, promote, withdraw, discipline, remove and transfer its employees.

(…)

It is understood that these rights, authority and faculty of the Hospital will remain in effect during the entire life of this Agreement and will only be subject to the limitations expressly contained in this Agreement, it being understood that nothing mentioned up to now may be used in bad faith, indiscriminately, in violation of the Agreement or against the seniority rights, it also being understood that the exercise of these prerogatives is not subject to the complaints and grievance procedure, except if an employee is disciplined or dismissed, in which case the Complaints and Grievance Committee will have jurisdiction to elucidate the complaint.

 [CDJA- Vol. I. GC Ex. 2(b), p. 121-124; GC Ex. 3(b), p. 205-208; GC Ex. 4(b), p. 288-291; GC Ex. 5(b), p. 369-371].] (emphasis supplied).

Additionally, despite Board's determination, the CBAs do not provide a guaranteed minimum number of daily or weekly hours to be worked or paid (even

if they did not work them) for unit employees. [CDJA- Vol. III. Pt 2 Tr., p. 1725, ln. 3 – 7]. Rather, employees are paid only for the hours they worked. [CDJA- Vol. III. Pt 1 Tr., p. 1439, ln. 3 – 5; p. 1455, ln. 11 – 15; p. 1456, ln. 17 – 21; p. 1461, ln. 5 – p. 1462, ln. 4; p. 1464, ln. 12 – 25; p. 1465, ln. 3 - 14] [CDJA- Vol. II. HDLC Ex. 1, p. 1364]. The only article of the CBAs that mentions hours is Article XIII, which defines what will be considered a "weekly regular work day" and a "regular daily work day". [CDJA- Vol. I. GC Ex. 2(b), p. 102-103; GC Ex. 3(b), p. 184-185; GC Ex. 4(b), p. 267-268; GC Ex. 5(b), p. 350-351].

However, the language of this article does not impose upon the Hospital the obligation to provide a guaranteed minimum number of hours an employee must work in a day or a week, nor does it provide an entitlement to the unit employees to a fixed number of hours they must work or get paid per day or per week. Rather, the article only establishes what will be considered regular work. This interpretation advanced by the Hospital is even more apparent when considering other articles in the CBAs that impose affirmative obligations on the Hospital with regards to the employees. To that effect, Article XIV of the CBAS provides that "every employee (…) **will be entitled** to two days of rest for every 5 consecutive days of work". [CDJA- Vol. I. GC Ex. 2(b), p. 104; GC Ex. 3(b), p. 186; GC Ex. 4(b), p. 269; GC Ex. 5(b), p. 352]. (emphasis supplied)). Therefore, in the case of this article, the language clearly provides that the employee is guaranteed two (2) days of rest if the

19

conditions in the article are met. Similarly, Article XV of the CBAs guarantee that employees will be entitled to an hour or a half hour break to take their meal, and if they do not take their meal. ("Every employee will enjoy a period of one (1) hour or half an hour (1/2) to take their meals") [CDJA- Vol. I. GC Ex. 2(b), p. 105; GC Ex. 3(b), p. 187; GC Ex. 4(b), p. 270; GC Ex. 5(b), p. 353].Article XVII of the CBAS guarantee that employees will receive pay even if they do not work during holidays. ("Employees shall receive full pay even if they do not perform any work during [specific] holidays" [CDJA- Vol. I. GC Ex. 2(b), p. 106-107; GC Ex. 3(b), p. 188-189; GC Ex. 4(b), p. 271-272; GC Ex. 5(b), p. 354-355].

Also, Article XXII requires the Hospital to pay a Christmas Bonus to unit employees. ("The Hospital shall grant a Christmas Bonus to the employees covered by this [CBA]" [CDJA- Vol. I. GC Ex. 2(b), p. 110; GC Ex. 3(b), p. 194; GC Ex. 4(b), p. 277; GC Ex. 5(b), p. 358]. Article XXIII requires that the Hospital provide unit employees with a life insurance and the amount of the life insurance. ("The Hospital will provide a life insurance of $14,000.00 for every employee in this agreement.") [CDJA-V Vol. I. GC Ex. 2(b), p. 111; GC Ex. 3(b), p. 195; GC Ex. 4(b), p. 278; GC Ex. 5(b), p. 359] [CDJA- Vol. III. Pt 2 Tr., p. 1621, ln. 5 – p. 1622, ln. 1]. Article XXVI require the Hospital to pay unit employees for the uniforms they are required to pay. ("The Hospital will pay the employees who are required to wear uniforms the amount of $300.00 per year" [CDJA- Vol. I. GC Ex. 2(b), p. 112; GC

20

Ex. 3(b), p. 196; GC Ex. 4(b), p. 279; GC Ex. 5(b), p. 360].  [CDJA- Vol. III. Pt 2
Tr., p. 1622, ln. 2 – 20].

As we can see, the Hospital and the Union were careful when drafting the
different articles of the CBAS to include language that entitled the employees to
certain benefits or imposed on the Hospital the obligation to provide the employees
with certain benefits. This language was not used or included in Article XIII.
Therefore, it stands to reason, that a review of the language used in the CBAs, as a
whole, shows that Article XIII does not establish a guaranteed minimum number of
workhours per employee, per day or per week.

Another issue that makes it clear that it was not the intention of the parties to
impose a minimum number of guaranteed hours per day, per week or per month is
that the CBAs cover both full-time and part-time employees [CDJA- Vol. III. Pt 2
Tr., p. 1643, ln. 14 – 19]. It is important to stress that contrary the Board's and the
ALJ's findings, Mr. Echevarria never testified that there was a prearranged
agreement between the Hospital and the Union to allow some employees to work
less than forty (40) hours. Moreover, no such agreement was presented in evidence
by the Union or the General Counsel.

Article XIV of the CBAs also shows that Article XIII of the CBAs only
defines what is considered a regular work week and not an imposition on the
Hospital to provide a minimum number of hours to its employees per week. Article

XIV states that "[t]o determine, when it is that said rest period commences and ends, there will be taken into consideration the time and the day that the work week of the employee commenced, according to what is established in [Article XIII] regarding Work Schedule." [CDJA- Vol. I. GC Ex. 2(b), p. 104; GC Ex. 3(b), p. 186; GC Ex. 4(b), p. 269; GC Ex. 5(b), p. 352]

Furthermore, during the testimony of Mr. Ruiz, an emergency room nurse and witness for the CGC, he admitted that before April 2020, he had been sent home early from work three (3) to four (4) times a year because of lack of work.) [CDJA- Vol. III. Pt 1 Tr., p. 1474, ln. 11 – 22]. No evidence was presented to show that in each of those instances the Union sought bargaining, complained that the decision to reduce the employee's work hours ran counter to the provisions of the CBAs, that the Hospital had the obligation to pay the employee for forty (40) hours of work each week or eight (8) hours each day, despite the number of actual hours worked, or that the Hospital had an obligation to allow him to remain in the workplace until he met the alleged forty (40) hour work quota.

Since Article XIII of the CBAs only provides a definition of what is considered a regular weekly work schedule for purposes of determining when overtime would begin, the CBAs do not contain language that impose an obligation for the Hospital to provide unit employees with a guaranteed minimum number of hours per week. If the CBAs do not require that unit employees be assigned to work

a minimum number of hours per week, then there is no language in the CBAs that would prevent the Hospital from exercising its contractual rights, as set forth in Article XXXII, Administration Rights.

In the instant case, as a result of the COVID-19 pandemic declared by the Governor of Puerto Rico during the month of March 2020, and the Executive Orders that followed said declaration, the number of patients that visited the Hospital and the Hospital's average daily census decreased. [CDJA- Vol. III. Pt 1 Tr., p. 1452, ln. 25 – p. 1453, ln. 19; p. 1454, ln. 13 – 20; CDJA- Vol. III. Pt 2 Tr., p. 1680, ln. 2 – 7; p. 1681, ln. 16 – 21]. In light of the situation, the Hospital's Executive Board implemented a reduction in hours among the employees that they identified could be excused from reporting to work several days per week to avoid unnecessarily exposing employees to the virus, with the caveat that once the need for services improved the employees would be contacted to readjust their schedule. [CDJA- Vol. I. GC Ex. 9(b) pgs. 802-807] [CDJA- Vol. III. Pt 2 Tr., p. 1681-, ln. 22 – 1683, ln. 11 – 20] [CDJA- Vol. II. HDLC Ex. 12, p. 1368-1370].

The absence of any language in the CBAs requiring that the Hospital provide the unit employees with a minimum number of hours per week and the language of the Administration Rights Article of the CBAs show that the Hospital had no obligation to bargain with the ULEES regarding the reduction of work hours. Particularly, the Administration Rights Article recognized that the Hospital retained

the right, power, authority, and prerogatives to establish and change work shifts, to assign personnel to particular work shifts, to determine the number of employees that will work during a work shift and even to temporarily suspend or remove employees. These rights reserved to the Hospital show that the parties agreed, and it was their intention, to allow the Hospital to reduce the work hours of the employees during the life of the CBA without further bargaining with the Union.

Furthermore, there is no language in the CBAs that runs counter to the language of the Administration Rights Article to require the Hospital to bargain with the Union the reduction in hours or its effects. In fact, as previously mentioned, the only article that mentions in some way work hours is Article XIII, yet said article only defines what is considered a regular work week or workday, it does not impose an obligation on the Hospital to provide a guaranteed minimum number of hours per week to its unit employees.

Additionally, the past practice, as proven by the testimony of the General Counsel's witnesses, is that the unit employees are paid only for the hours worked, which in cases was less than eighty (80) hours in a biweekly period, and at times employees were sent home early from work because of lack of work. Had the parties agreed in the CBA that the employees had a guaranteed minimum number of work hours, employees would always be assigned to work forty (40) hours per week and their paychecks would reflect payment for, at least, forty (40) hours per week. The

Board's conclusion would prevent the Hospital from excusing unit employees from work due to lack of work, yet the testimony during the Hearing showed that before 2020 it was the practice of the Hospital to send employees home for lack of work and the Union never objected to this practice before.

In light of the above, the Hospital respectfully submits that the forced conclusion is that the Hospital had the right to implement the reduction in hours without further bargaining with the Union since the Management Rights article of the CBA provided it with the right to do so. As a result, the Hospital did not violate the Act when it implemented a reduction in work hours without bargaining with the Union.

B. <u>The Hospital had a Sound Arguable Basis for Reducing the Work Hours.</u>

To the extent that the Board found that the Union bargained in the CBA for regular work schedules consisting of 40 hours in 5 consecutive 8-hour days followed by 2 consecutive days off, (Decision, p.1, fn.4) [CDJA- Vol. III. Pt. 2 Decision, p. 1910, fn. 4], the Board held that the Hospital departed from the contractual agreement it reached with the Union in the CBAs. <u>Honeywell International, Inc. v. NLRB</u>, 253 F.3d 119 (D.C. Cir. 2001). Thus, the Board had to consider whether the Hospital had a sound arguable basis for its interpretation and was not forbidden from implementing the reduction in work hours without bargaining with the Union.

25

An employer violates Sections 8(a)(5) and (1) of the Act by modifying terms and conditions of employment established in a CBA. 29 U.S.C. §§ 158(a)(1), (5), 158(d). Because the unfair labor practice question derives from an employer's statutory duty to bargain, a midterm modification is unlawful only if it involves a mandatory subject of bargaining for which the employer was required to bargain in the first place. Allied Chem. & Alkali Workers of Am., Local Union No. 1 v. Pittsburgh Plate Glass Co., 404 U.S. 157, 185–88 (1971).

"An employer has not violated Section 8(a)(5) by modifying terms and conditions of employment under a CBA if the employer has a 'sound arguable basis' for its interpretation of a contract and is not motivated by animus or bad faith." Pacific Maritime Association v. NLRB, 967 F.3d 878, 885 (D.C. Cir. 2020) (quoting Bath Iron Works, 345 NLRB 499, 502 (2005)). However, if the employer's interpretation runs counter to the clear interpretation of the parties, or the collective bargaining agreement "cannot be colorably interpreted to permit" the interpretation advanced, then there will not be a "sound arguable basis" for the employer's interpretation. Id. (quoting MV Transportation, Inc., 368 NLRB No. 66 at *30

The Board has held that a "unilateral change" allegation is different from a "contract modification" allegation "in terms of principle, possible defenses, and remedy." Bath Iron Works Corp., 345 NLRB at 501. In a "unilateral change" claim, the General Counsel does not have to show "the existence of a contract provision",

26

only "that there is an employment practice concerning a mandatory bargaining subject, and that the employer made a significant change there to without bargaining." *Id.*

In a contract modification case, the General Counsel must show that there was a collective bargaining agreement or a provision of collective bargaining that the employer modified. <u>MV Transportation</u>, 368 NLRB at *27. (citing *Bath Iron Works Corp, supra*). In other words, that the employer did not comply with the agreement reached with the union. *Id.* Thus, the first one is a failure bargain claim and the second one is a failure to adhere by the contract claim.

It is important to highlight that the "employer's interpretation need not be the only reasonable interpretation in order to pass muster under the 'sound arguable basis' standard. If an employer has a sound arguable basis for its interpretation and the General Counsel also presents a reasonable interpretation of the relevant contractual language, the Board will not seek to determine which interpretation is correct.(…) Under those circumstances, the employer will not have violated the Act." <u>MV Transportation</u>, 368 NLRB at *28.

In this case, to the extent that the CGC and HDLC, and then the Board in its Decision, rely on their interpretation of Article XIII to establish whether unit employees were guaranteed a minimum number of hours per day and per week, an analysis under the "sound arguable basis" standard was warranted.

27

The evidence presented at the Hearing establishes that the Hospital had a sound arguable basis for its interpretation that the CBAs gave it the right to implement a reduction in work hours without bargaining with the Union. As stated earlier, the Administration Rights clause provided the Hospital with the right to determine the number of employees to work, the right to suspend and remove employees, and the right to establish and change work shifts. [CDJA- Vol. III. Pt 2 Tr., p. 1610, ln. 14 – 24; p. 1708, ln. 2 – 18] [CDJA- Vol. I. GC Ex. 2(b), p. 121-124; GC Ex. 3(b), p. 205-208; GC Ex. 4(b), p. 288-291; GC Ex. 5(b), p. 369-371]. Furthermore, an analysis of the language in Article XIII in comparison with other articles of the CBA supports the Hospital's interpretation that Article XIII does not impose an obligation on the Hospital to assign a guaranteed minimum number of hours to unit employees. In particular, the Hospital refers to Articles XV, XVII, XXII, XXIII, XVI of the CBAs. Each of these articles contain language that show an intention by the parties to impose an obligation on the Hospital to provide the employee with something. Article XV states that the employee **will enjoy** a period of time take their meal and if an employee does not the Article establishes that the Hospital **must pay** the employee a determined amount. [CDJA- Vol. I. GC Ex. 2(b), p. 105; GC Ex. 3(b), p. 187; GC Ex. 4(b), p. 270; GC Ex. 5(b), p. 353]. Article XVII of the CBAs state that the employees **shall receive full pay** even if they do not perform work during specific holidays. Thus, imposing an affirmative obligation for

28

the Hospital to provide the employee with payment regardless of whether the employee worked. [CDJA- Vol. I. GC Ex. 2(b), p. 106-107; GC Ex. 3(b), p. 188-189; GC Ex. 4(b), p. 271-272; GC Ex. 5(b), p. 354-355].

According to Article XXII, the Hospital **shall grant a Christmas Bonus** to employees covered by the CBA. [CDJA- Vol. I. GC Ex. 2(b), p. 110; GC Ex. 3(b), p. 194; GC Ex. 4(b), p. 277; GC Ex. 5(b), p. 358]. Similarly, in Article XXIII the parties agreed that the Hospital **will provide a life insurance** to the unit employees. [CDJA- Vol. I. GC Ex. 2(b), p. 111; GC Ex. 3(b), p. 195; GC Ex. 4(b), p. 278; GC Ex. 5(b), p. 359].  Finally, in Article XXVI, the parties agreed that the Hospital **will pay** the employees that are required to wear uniforms a particular amount per year. [CDJA- Vol. I. GC Ex. 2(b), p. 112; GC Ex. 3(b), p. 196; GC Ex. 4(b), p. 279; GC Ex. 5(b), p. 360]. These three (3) articles also impose an obligation to the employer that it must do something in favor of the employees, Hospital will grant, pay or provide the employees. However, a review of Article XIII reveals that the parties did not include this type of language in regard to the hours of work. Article XIII lacks any phrasing to the effect that the Hospital assign employees to a fixed forty (40) work hours per week or any other number of hours. It is important to stress that during the negotiations for the CBA, the parties bargained over the language to be included in the CBA. [CDJA- Vol. III. Pt 2 Tr., p. 1607, ln. 19 – 23]. Thus, the parties decided to construct Article XIII differently than they had done other articles

where they intended impose an obligation on the Hospital to provide its employees with a benefit or a right. The parties' conscious decision to not include language in Article XIII to the effect that the Hospital shall provide unit employees with a predetermined number of hours per week cannot be ignored and gives credence to the Hospital's interpretation that it was not under any contractual obligation to assign the unit employees a minimum number of hours per week.

Furthermore, the fact that the CBA covers both full-time and part-time employees [CDJA- Vol. III. Pt 2 Tr., p. 1643, ln. 14 – 19], gives weight to the Hospital's interpretation that Article XIII does not impose an obligation on the Hospital to provide a minimum number of work hours to unit employees. Neither the CBAs nor Article XIII make any mention of part-time or full-time employees or the number of hours that each classification must or is allowed to work. Thus, the existence of part-time unit employees, as acknowledged by Mr. Ariel Echevarria, is evidence that Article XIII does not require that the Hospital assign or schedule a minimum number of hours per week to each Unit employee.

The evidence presented at the Hearing shows that the Hospital has a sound arguable basis to interpret that Article XIII does not create an obligation upon the Hospital to grant certain number of work hours per week to unit employees, and that pursuant to the Administration Rights Article, the Hospital had the right and

30

prerogative to implement the reduction in work hours without bargaining the decision or its effects with the Union.

The Hospital also submits that the evidence in the Hearing shows that there was no union animus or bad faith when it implemented the reduction in hours. The Board makes no determination to that effect. Also, the ALJD found that the reduction in work hours also applied to nonunion employees. Additionally, witness testimony showed that the decision to implement the reduction in work hours was due to the effects that the pandemic had on the Hospital's operations and the demonstrated reduction in average daily census, which from February 2020 to April 2020 showed a decrease of approximately sixty (60) patients.) [CDJA- Vol. III. Pt 1 Tr., p. 1452, ln. 25; p. 1453, ln. 19; p. 1454, ln. 13 – 20; CDJA- Vol. III. Pt 2 Tr., p. 1637, ln. 4 – 15; p. 1680, ln. 2 – 7; p. 1681, ln. 16; p. 1683, ln. 10] [CDJA- Vol. II. HDLC Ex. 12, p. 1368-1370] [CDJA- Vol. II. GC Ex. 12(a) pgs. 916-917]. Therefore, the decision was not guided by animus towards the Union, rather the situation that was happening in Puerto Rico at the time due to the COVID-19 pandemic and how it was affecting the Hospital. No bad faith or union animus can be inferred since in addition to unit employees, administrative personnel experienced a reduction in work hours. [CDJA- Vol. III. Pt 2 Tr., p. 1683, ln. 11 – 24]. For example, Mr. Jorge Rodríguez, the Hospital's Human Resources Director,

had a reduction in work hours of one (1) day per week. [CDJA- Vol. III. Pt 2 Tr., p. 1718, ln. 23 – p. 1720, ln. 1; p. 1727, ln. 6 – 19].

Based on the above, the Hospital respectfully submits that it had a sound arguable basis for its interpretation that the CBAs gave it the right to implement a reduction in work hours among the unit employees without further bargaining with the Union.

C. Exigent Circumstances allowed the Hospital to Implement Reduction in Hours Without First Bargaining with the ULEES.

Two (2) exceptions to the rule that an employer violates Section 8(a)(5) when it makes a unilateral change to a mandatory subject without first bargaining are: 1) when, in response to an employer's diligent and earnest efforts to engage in bargaining, a union insists on continually avoiding of delaying bargaining; 2) when economic exigencies compel prompt action. Bottom Line Enterprises, 302 NLRB 373, 374 (1991).

In RBE Electronics of S.D., Inc., 320 NLRB 80, 81 (1995), the Board recognized that there are certain compelling economic considerations which excuse bargaining entirely about certain matters. In these instances, to implement an action without bargaining, the employer must be faced with "extraordinary events which are 'an unforeseen occurrence, having a major economic effect [requiring] the company to take immediate action." *Id.* (Internal quotations omitted).

32

The situation faced by the Hospital in the instant case was the global pandemic caused by COVID-19 and the lockdown orders issued by the Government of Puerto Rico. [CDJA- Vol. II. GC Ex. 15 p. 1348-1352 and GC Ex. 16 p. 1353-1363, HDLC. Ex. 27 p. 1374-1395]. It is important to note that the first lockdown order was issued on March 15, 2020 and lasted until March 30, 2020. [CDJA- Vol. II. GC Ex. 15 p. 1348-1352] [CDJA- Vol. III. Pt 2 Tr., p. 1704, ln. 5]. Later a second lockdown order was issued on March 30, 2020, which extended the lockdown from March 31, 2020, until April 12, 2020. [CDJA- Vol. II. GC Ex. 16 p. 1353-1363]. Then, a third lockdown order was issued on April 12, 2020, which extended the lockdown until May 3, 2020. [CDJA- Vol. II. HDLC. Ex. 27 p. 1374-1395]. Contrary to the ALJ's determination, the Hospital was faced with an uncertain situation where neither the Hospital nor even the population of Puerto Rico knew how long the lockdown would last and whether it would be extended.

In these circumstances, the Hospital was faced with an extraordinary and unexpected event, the COVID-19 pandemic, which caused the unforeseen lockdown of Puerto Rico. Furthermore, as evidenced by the testimony of the Hospital's witnesses, the COVID-19 pandemic and the lockdowns that followed had an economic impact on the Hospital since the lockdowns prohibited the Hospital from carrying out all elective surgeries and procedures [CDJA- Vol. III. Pt 2 Tr., p. 1681, ln. 5-9] and caused a significant reduction in the patients that visited the facilities.

33

[CDJA- Vol. III. Pt 2 Tr., p. 1681, ln. 5-9; P. 1684, ln. 8-11; P. 1687, ln. 18-25; P. 1688, ln. 1-3] [CDJA- Vol. II. HDLC Ex. 18 p. 1373]. From February 2020 to April 2020, when the reduction in hours was implemented, there was a decrease in the average daily census from 129 to 73. [CDJA- Vol. III. Pt 2 Tr., p. 1637, ln. 4 – 15] [CDJA- Vol. II. GC Ex. 12(a), pgs. 916-917]. Due to the sharp decrease in procedures and visits to the Hospital by patients caused by the unexpected lockdowns and COVID-19 pandemic, the Hospital believed it needed to implement immediate actions to mitigate the situation it was faced with.

Certainly, the situation the Hospital faced as a result of the pandemic and the lockdowns that followed was an atypical situation that had not been seen before. It was entirely due to circumstances beyond the Hospital's control but had direct consequences on the Hospital's finances and projected finances. Given that scenario, the Hospital was faced with exigent circumstances that allowed it to implement the required reduction in work hours without further bargaining with the Union.

D. The Hospital Complied with Its Obligation to Provide Information.

The Decision concludes that the Hospital failed to provide the Union with the information requested the Hospital violated the Act. However, the Decision ignores that since the Hospital was contractually allowed to implement the reduction in hours without bargaining, the Hospital had no obligation to provide information whose purpose was to bargain over the decision to implement the reduction of hours. But,

34

even if the Hospital had to provide the requested information, the ALJD and the Decision fail to acknowledge that the Hospital responded to the Union's requests.

"[A]n employer has a duty to furnish requested information to a union which is the collective-bargaining representative of the employees if the requested information is relevant and reasonably necessary to the union's performance of its responsibilities." Southern California Gas Company and Utility Workers Union of America, Local 483, 342 NLRB 56 (2004). If the union requests information related to the terms and conditions of employment it is understood that that information is "presumptively relevant." However, if the union requests information that is not relevant for the union to perform its responsibilities as bargaining representative, then the information is not presumed relevant and the union bears the burden of proving that the peculiar circumstances of a case make the information relevant and, as a consequence, forces the employer to comply with the union's request. Southern California Gas Company and Utility Workers Union of America, Local 483, 342 NLRB 56 (2004).

However, Board precedent provides that if an employer does not have a duty to bargain over a particular matter or decision, the employer then has no duty to provide the Union with any information related said decision. ADT, LLC d/b/a ADT Security Services, 369 NLRB No. 31 (2020).

As the evidence detailed above and the discussion that precedes shows, during the month of April 2020, the Hospital implemented a reduction in work hours. When the Hospital implemented the reduction in work hours it did not notify nor bargain with the Union, since the CBAs in effect at the time gave the Hospital the right to implement the decision without prior bargaining. Before the Hospital implemented the reduction in work hours, however, it notified its employees via letter dated April 14, 2020, of the reduction in hours to be implemented. [CDJA- Vol. II. HDLC Ex. 12, p. 1368-1370]. On the following day, on April 15, 2020, the Hospital notified each employee how the reduction in work hours would be applied to him or her. [CDJA- Vol. I. GC Ex. 9(b) pgs. 802-807].

The Union obtained copies of the letters that the Hospital gave to its employees and after reviewing them sent three (3) separate requests for information to the Hospital. The first request for information was sent on April 15, 2020. [CDJA- Vol. I. GC Ex. 6(b) p. 376-377]. The second request for information, which amended the April 15 request for information, was sent on April 16, 2020. [CDJA- Vol. III. Pt 1 Tr., p. 1514, ln. 15 – 18] [CDJA- Vol. I. GC Ex. 7(b) p. 379]. Finally, the third request for information was sent on April 21, 2020. [CDJA- Vol. I. GC Ex. 8(b) p. 382-383].

During the Hearing, Mr. Ariel Echevarria, Union representative, admitted that all three (3) requests for information were sent to the Hospital to bargain over the

reduction in hours and to present alternatives to the Hospital so the reduction was not implemented or to explore how the unit employees would be the least affected. [CDJA- Vol. III. Pt 1 Tr., p. 1510, ln. 8 – p. 1511, ln. 2; p. 1519, ln. 16 – 25; p. 1530, ln. 19 – p. 1531, ln. 10; p. 1580, ln. 20 – p. 1582, ln. 11]. Thus, the requests for information were geared towards bargaining the decision made by the Hospital.

Since, as previously discussed, pursuant to the CBAs, the Hospital could implement a reduction in work hours without bargaining with the ULEES, the Hospital had no duty or obligation to further bargain with the Union said decision or its effects. However, the ULEES sought to bargain the Hospital's decision to reduce the unit employees work hours and its effects even though the CBA already gave the right to the Hospital to implement said decision without bargaining. Given that the Union's requests for information were drafted to seek information to bargain the reduction in work hours, the information requested by the Union was not relevant and the Hospital had no duty to provide it to the Union.

Notwithstanding the above, in the unlikely event that it is determined that the Hospital had to respond to the Union's information requests regardless of whether it could implement the decision without bargaining, the Hospital submits that -contrary to the Decision- it responded to the Union's requests for information.

During the Hearing, the Union admitted that the Hospital responded to its requests. [CDJA- Vol. III. Pt 1 Tr., p. 1576, ln. 1 – 13]. In that regard, on April 29,

2020, the Hospital sent several e-mails to the Union in response to the Union's request of April 15, 16, and 21. [CDJA- Vol. III. Pt 2 Tr., p. 1633, ln. 6 – 10] [CDJA-Vol. II. GC Ex. 14(b) p. 1143-1347]. Furthermore, on April 29, 2020, the Hospital provided additional information in response to the Union's April 21, 2020, e-mail since the Hospital provided the name, department, classification, salary, hire date or seniority, and position of all the employees in the endoscopy department as requested in the Union's April 21 request for information. [CDJA- Vol. III. Pt 1 Tr., p. 1588, ln. 11 - p. 1592, ln. 17] [CDJA-V Vol. II. GC Ex. 13(a) p. 919-930]. On April 29, 2020, the Hospital also sent the Union a copy of the work programs of the areas impacted by the reduction in work hours, as requested in the April 15 and 16 requests for information.  [CDJA- Vol. III. Pt 1 Tr., p. 1541, ln. 8 – 19] [CDJA- Vol. II. GC Ex. 10(b) p. 833]. On May 6, 2020, Mr. Jorge Rodríguez sent another e-mail to the Union in response to its requests for information dated April 15, April 16, and April 21, 2020. [CDJA- Vol. III. Pt 1 Tr., p.  1568, ln. 15 – p. 1569, ln. 17] [CDJA-Vol. II. GC Ex. 14(b) p. 1143-1347]. The Union never replied to the Hospital's responses of April 29 and May 6, 2020. [CDJA- Vol. III. Pt 1 Tr., pg. 1574, ln. 2 - p. 1576, ln. 13]. Since the Union never responded to the Hospital's responses the Hospital believed no more information was pending or owed to the Union.

Furthermore, the Decision ignores that the Union's position, as expressed at the Hearing is that the Hospital took too long, fifteen (15) days, to produce the

information requested. [CDJA- Vol. III. Pt 1 Tr., pg. 1534, ln. 20 – 24] [CDJA- Vol. III. Pt 1 Tr., p. 1576, ln. 1 – 13]. However, the Hospital submits that it did not take too long in light of the circumstances surrounding the requests for information. Mr. Rodríguez -the Hospital's Human Resources Director at the time the reduction was implemented- testified that the delay in responding to the Union's request was due to the amount of information requested and because he and the secretary for the Human Resources Department suffered a reduction in work hours as well. [CDJA- Vol. III. Pt 2 Tr., pg. 1727, ln. 20 – p. 1728, ln. 7]. In Mr. Rodríguez's case his work was limited to four (4) days per week and only three (3) days per week were spent physically present in the Hospital. [CDJA- Vol. III. Pt 2 Tr., p. 1718, ln. 23 – p. 1720, ln. 1; p. 1727, ln. 6 – 19]. Considering the above and that Mr. Rodríguez was only present in the Hospital three (3) days a week, a delay of (15) calendar days, in essence two (2) weeks does not constitute a refusal by the Hospital to provide the information requested.

Given that the Union admitted that the Hospital provided the requested information, the conclusion that the Hospital failed and refused to provide the information requested by the Union is incorrect.

In light of the above, even though the Hospital submits that it responded to the Union's requests for information and, thus, complied with its statutory obligations, in the event that it is determined that the Hospital did not respond to the

39

Union's requests for information, the Hospital submits that it had no obligation to provide the information requested since the Union's intention was to negotiate a matter that was already covered by the CBA and did not have to be bargained with the Union. Under such circumstances and applicable case law, even if the Hospital had refused to provide the information requested by the Union it would not be an unlawful action.

   E. The Board Should Deduct Interim Earning in Case of Award.

   In the Decision, the Board held that the "make-whole remedy shall be computed in accordance to *Ogle Protection Service,* 183 NLRB 682 (1970), enfcd. 444 F.2d 502 (6th Cir. 1971), rather than with *F. W. Woolworth Co.*, 90 NLRB 289 (1950)". [CDJA- Vol. III. Pt. 2 Decision, p. 1911, fn. 5]. The Board explained that the *Ogle Protection* formula applies because in this case there was no cessation of employment. As a result, as part of the make-whole remedy, the Board should deduct any interim earnings. HDLC rejects said interpretation since it would provide a windfall for unit employees that had interim earnings -including pandemic unemployment assistance based on reduction of hours or lack of work- during the period that their work hours were reduced and because the facts in *Ogle Protection* are clearly distinct from the instant case thus, they should not be applicable. (*Ogle Protection* dealt with the unlawful withdrawal of recognition of a union and the

subsequent cessation of union dues from employees' paychecks, thus the unit employees' working conditions remained unaltered).

In this case, the unit employees' working hours were reduced, if any unit employee obtained employment during that period of time to compensate for the reduction in hours at the Hospital or received benefits only available to employees who experienced a reduction in work hours or layoff due to the COVID-19 pandemic, then the Board's remedy of not considering interim earnings would amount to a windfall for those employees.  Thus, instead of a make-whole remedy, it would be a punitive remedy for the Hospital. However, for over 80 years the Supreme Court has held that Board is allowed to restore the "actual losses" employees suffer—no more or less. Phelps Dodge v. NLRB, 313 U.S. 177, 197–98, (1941).

To be clear, the Hospital acknowledges that there is no duty to mitigate in reduction of work hours under extant Board case law, however, this cannot mean that the Board should ignore interim earnings when calculating backpay to ensure that no employee receives a windfall. Thus, the Hospital submits that if *Ogle Protection* formula will be applied when fashioning the remedy and backpay, then the Board must consider and deduct any interim earnings the unit employees had while the reduction in work hours were in place.

41

## VIII.    CONCLUSION

Based on the foregoing, the Hospital requests that the Honorable Court of Appeals set aside the Decision and deny enforcement of the Decision.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 8th day of September 2023.

s/José R. González-Nogueras
**JOSÉ R. GONZÁLEZ NOGUERAS**
USCA-DC No. 53881
Email address: jgonzalez@pg.legal

**Pizarro & González**
P.O. Box 194302
San Juan, P.R. 00919-4302

650 Plaza, Suite 502
650 Muñoz Rivera Ave.
San Juan, Puerto Rico 00918
Tel.:  (787) 767-7777
Fax:   (787) 763-2286

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, the undersigned hereby certifies that the Hospital's Brief contains 10,802 words, as counted by a word processing system that includes headings, footnotes, quotations, and citations, excluding the items listed in Rule 32(f) of the Federal Rules of Appellate Procedures, and therefore is within the word limit set by the Court. The undersigned further certifies that the Opening Brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because the brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman Font.

*s/José R. González-Nogueras*
**JOSÉ R. GONZÁLEZ NOGUERAS**
USCA-DC No. 53881
Email address: jgonzalez@pg.legal
Attorney for Petitioner

43

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. Rules 25(d) and 25(c), and Circuit Rule 25(d), I hereby certify that on this September 8, 2023, a true and correct copy of the foregoing Hospital's Brief was served via electronic mail on the following:

Mr. Ariel Echeverria                      echevarria@unidadlaboral.com

María Margarita Fernández, Esq.        Mariafernandezlawoffice@gmail.com

Ruth E. Burdick, Esq.                    ruth.burdick@nlrb.gov

Usha Dheenan, Esq.                       usha.dheenan@nlrb.gov

Brady Francisco-FitzMaurice, Esq.       brady.francisco-fitzmaurice@nlrb.gov


s/José R. González-Nogueras
**JOSÉ R. GONZÁLEZ NOGUERAS**
USCA-DC No. 53881
E-mail address: jgonzalez@pg.legal
Attorney for Petitioner